# FILED

October 29 2012

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA



DA 11-0667

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 240

CLARK FORK COALITION, EARTHWORKS,
TROUT UNLIMITED, and ROCK CREEK ALLIANCE,

        Plaintiffs and Appellees,

   v.

DEPARTMENT OF ENVIRONMENTAL QUALITY,
REVETT SILVER COMPANY, and RC RESOURCES, INC.,

        Defendants and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDV 2008-518
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            KD Feeback; Alan Joscelyn; Gough, Shanahan, Johnson & Waterman,
PLLP, Helena, Montana

        For Appellees:

            David K. W. Wilson, Jr., Morrison, Motl & Sherwood, Helena, Montana
Matthew Clifford, Attorney at Law, Oakland, California

                    Submitted on Briefs:  July 25, 2012
                              Decided:  October 29, 2012

Filed:

_____
                        Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1    Revett Silver Company and RC Resources, Inc., (collectively "Revett") appeal from an order issued by the First Judicial District Court, Lewis and Clark County, granting summary judgment in favor of the Clark Fork Coalition, Earthworks, Trout Unlimited and Rock Creek Alliance (collectively "Plaintiffs").  We affirm.

## BACKGROUND

**1. Legal Background**

¶2    The Montana Water Quality Act makes it unlawful to cause pollution of any state waters from a point source without a valid Montana Pollutant Discharge Elimination System (MPDES) permit. Section 75-5-605(2)(c), MCA.   Under the MPDES program the Department of Environmental Quality (DEQ) may issue permits for storm water discharges associated with construction activity.  Admin. R. M. 17.30.1105 (2008).  Storm water discharge associated with construction activity is a discharge of storm water runoff, snow melt runoff, or surface runoff and drainage into state waters as a result of construction activities including clearing, grading, and excavation that result in the disturbance of an acre or more of total land area.  Admin. R. M. 17.30.1102(27), (28) (2008).

¶3    Any person who discharges or proposes to discharge storm water associated with construction activity must obtain either an individual permit or a general permit.  Admin. R. M. 17.30.1105(1)(a); *See also* Admin. R. M. 17.30.1341(1)(j) (2008).  In order to operate under an individual permit, a person must submit a detailed application, including analysis of the proposed discharge and site-specific controls to ensure the discharge will not violate water quality standards.  Admin. R. M. 17.30.1322 (2008).  Whereas to operate under a

2

general permit for storm water discharge associated with a construction activity, a person must only submit a notice of intent together with a pollution control plan. Admin. R. M. 17.30.1115 (2008). In place of the detailed site-specific controls provided by an individual permit, a general permit requires only that a storm water discharger follow standard best management practices (BMPs) that DEQ has found generally sufficient to meet water quality standards across the state. Admin. R. M. 17.30.1115.

¶4 However, DEQ may not issue a general permit if the "point source will be located in an area of unique ecological or recreational significance." Admin. R. M. 17.30.1341(4)(e). The determination of whether an area is of unique ecological or recreational significance is based upon considerations of Montana stream classifications, impacts on fishery resources, local conditions at proposed discharge sites, and designations of wilderness areas or of wild and scenic rivers. Admin. R. M. 17.30.1341(4)(e).

2. **Factual and Procedural Background**

¶5 The Rock Creek Mine was initially proposed in the late 1980s with the goal of extracting copper and silver from the Cabinet Mountains. After the mine was initially proposed, various state and federal agencies spent more than a decade examining the potential impacts that the mine would have on the surrounding environment, including Rock Creek, the lower Clark Fork River, and the adjacent Cabinet Wilderness Area. This review culminated in September 2001 when DEQ and the U.S. Forest Service issued a final draft of a joint Environmental Impact Statement (EIS).

¶6 As described in the EIS, the mine would be developed in two phases. In the first phase, the exploration phase, Revett would drill an 18-foot wide, 1.25 mile long, evaluation

3

adit, or mine shaft, to reach the ore body. The adit would generate substantial volumes of waste rock and ore. In the second phase, the production phase, Revett would drill parallel tunnels beginning at the confluence of the east and west forks of Rock Creek and extending some three miles beneath the Cabinet Mountains. Revett would then begin excavating the mine at a rate of approximately 10,000 tons of ore per day for an estimated 30 years.

¶7      The majority of the infrastructure associated with the mine will be constructed in the Rock Creek watershed. Rock Creek has two major branches, the East Fork and the West Fork, and is itself a tributary of the Clark Fork River near Noxon, Montana. The evaluation adit is located up the West Fork of Rock Creek, and the excavation tunnels are located at the confluence of the East and West Forks. Revett also plans to construct a milling facility at the confluence. Access to the milling site is provided by Forest Service road 150 and a combination of Forest Service roads 150 and 2741 provide access to the evaluation adit site. Forest Service road 150 parallels Rock Creek, and upstream from the confluence it parallels the West Fork of Rock Creek. Road 2741 branches off of Forest Service road 150 and extends nearly to the evaluation adit site. In order to use these roads, the EIS notes that Revett would need to improve them. This would include, among other things, road widening, installing turnouts, and corner widening.

¶8      Together, Rock Creek and its forks support an important population of bull trout, *Salvelinus confluentus*. Although previously abundant in western Montana, bull trout populations had dwindled and in 1998 the U.S. Fish and Wildlife Service (USFWS) listed them as threatened in the Columbia River Basin, which includes the Clark Fork River basin and Rock Creek. 63 Fed. Reg. 31647 (June 10, 1998); 50 C.F.R. § 17.11(h) (2008). After

4

bull trout were listed as threatened, the Forest Service, as required by Section 7 of the Endangered Species Act (ESA), formally consulted with the USFWS about the mine's effect on bull trout. The USFWS then released a formal biological opinion (BiOp) regarding the mine's effects on bull trout in 2000. The USFWS revised and supplemented its findings in succeeding BiOps released in 2003, 2006 and 2007. In the 2007 supplement, the USFWS issued a no jeopardy finding and concluded that the development of the mine would not jeopardize the existence of bull trout in the Lower Clark Fork area. Significantly, the agency did not make an explicit finding as to jeopardy to the Rock Creek population of bull trout. *Rock Creek Alliance v. United States Forest Serv.*, 703 F. Supp. 2d 1152, 1200 (D. Mont. 2010).

¶9 Rock Creek is one of only two tributaries, the other being Bull River, that support bull trout populations in the drainage of Cabinet Gorge Reservoir. According to the Montana Department of Fish, Wildlife and Parks (FWP), the Rock Creek and Bull River populations are the only two stocks in the surrounding area that have enough individuals to avoid a significant risk of extinction. Of these two, the Rock Creek stock is "considered unique (relative to Bull River) . . . [and it] is unlikely that bull trout would quickly recolonize Rock Creek if they became extirpated there." In the final EIS, DEQ and the Forest Service similarly concluded:

> Rock Creek is an *essential stock* for conservation purposes. Not only is the species more abundant than elsewhere locally, but Rock Creek is also in better condition physically. Given that these data also show that Rock Creek is well within the range of conditions preferred by the species, while most other streams are not, we support the findings of the State of Montana that *Rock Creek is one of the two watersheds where conservation efforts should focus on recovery of the migratory bull trout.*

5

(Emphasis added.)

¶10 Despite the importance of Rock Creek, habitat conditions for bull trout in Rock Creek are already on the edge because of past sediment deposition in the creek. Excessive sediment destroys bull trout's preferred spawning habitat of low gradient reaches of mountain valley streams with clean gravel and cobbly substrate. Fine sediments clog the spaces between the gravel and cobble needed by incubating eggs and fry. If sediment is deposited into interstitial spaces during incubation, it impedes water movement through the gravel, lowers the levels of dissolved oxygen, and inhibits the removal of metabolic waste. Even if an embryo incubates and develops successfully, the emerging fry can be entombed by the sediment. Juvenile and adult bull trout are also adversely affected.

¶11 Due to the already at-risk status of Rock Creek, any additional sediment deposition could threaten its bull trout population. In the 2000 BiOp, the USFWS concluded that "[a]ny increase in sediment deposition is a risk to bull trout habitat productivity and survival rate." Similarly, FWP stated, "Additional impacts [from an increase in sediment] could result in irreversible consequences." These consequences are particularly troublesome because, as noted by the Forest Service and DEQ, "the loss of Rock Creek as a spawning and rearing tributary could push the bull trout further towards elimination in this drainage." And, once eliminated, it is unlikely that bull trout would quickly recolonize the creek.

¶12 In light of the bull trout's precarious state, any action by Revett that results in sediment being deposited in Rock Creek could potentially extirpate bull trout from the Creek. Herein lays the potential problem for Revett, construction related to Phase I of the

6

mine—in particular road improvements—will likely lead to a discharge of sediment to the West Fork of Rock Creek for several years. The USFWS, in the 2007 supplemental BiOp, states:

> The most obvious direct impact of the construction and operation of the Rock Creek Mine to bull trout is the potential for an increased level of fine sediment entering the stream *during the 5-year* construction phase. Activities associated with the development of the mine include *road construction, road reconstruction, bridge and culvert replacement* [and] *alteration of existing roads* to conform to Best Management Practices (BMPs), and construction and development of tailings ponds, adit and mill sites, powerlines, and pipelines.

(Emphasis added.) Continuing, the BiOp notes that this increase in sediment levels "could reach a level to cause morphological channel changes (e.g., filling of pools, substrate embeddedness) that reduce the quality of rearing and foraging habitat for bull trout. During this same period, degradation in the quality of spawning habitat is likely due to deposits of fine sediment in spawning gravels." As a result, the USFWS concluded that increases in sedimentation "are anticipated to adversely affect and likely result in a take of the egg, larval and juvenile life history stages by harming or impairing feeding, breeding and sheltering patterns of adult and juvenile bull trout." Similarly, FWP concluded that the high levels of sediment input during the initial phase of the mine may "result in permanent loss of the Rock Creek bull trout stock."

¶13     In order to avoid these potentially disastrous consequences, the Forest Service and DEQ plan requires Revett to undertake BMPs to avoid sediment deposition. However, the Forest Service and DEQ admit that, even if Revett utilizes BMPs, bull trout in Rock Creek will be adversely affected because of "unavoidable fugitive sediment loading during project construction." The 2007 BiOp also notes that during construction, short-term increases in

7

sediment are unavoidable. This is because construction of the mitigation measures themselves will result in short-term increases in sediment and because the BMPs are less than 100 percent effective.

¶14 Prior to reconstructing the Forest Service roads, and increasing sediment deposition in Rock Creek, Revett submitted a Notice of Intent (NOI) to DEQ requesting approval to discharge sediment to Rock Creek for Phase I construction activities including:

> road improvements to the existing unpaved [Forest Service] access roads to the adit site, road widening at a number of identified locations to improve safety and access, borrow material sites adjacent to the access road, installation of a buried powerline and water pipeline in the access road, installation of arch culverts at three locations[,] road surfacing to reduce sediment yield from the road surface, installation of rolling dips as required by the [Forest Service], . . . and construction of an infiltration pond system for discharge of treated adit (mine) water to groundwater.

Revett sought approval under the General Permit for Storm Water Discharges Associated with Construction activity, also known as General Permit MTR 100000. As required by § 75-5-401(c), MCA, Revett submitted stormwater pollution prevention plan with its NOI. On August 22, 2008, DEQ approved the NOI and pollution prevention plan.

¶15 The Plaintiffs, in anticipation of Revett seeking approval for mine-related construction under General Permit MTR 100000, filed this action against DEQ on June 9, 2008. Revett subsequently intervened as a defendant. In the complaint, the Plaintiffs sought a declaratory judgment that use of general permits to approve stormwater runoff from the Rock Creek Mine would violate Admin. R. M. 17.30.1341(4)(e) because Rock Creek is an area of "unique ecological significance" based on considerations of impacts on fishery resource and local conditions at proposed discharge. On July 21, 2011, the District Court granted

8

summary judgment to the Plaintiffs and declared the general permit void. The court found that DEQ's approval of discharges associated with road reconstruction violated Admin. R. M. 14.30.1341(4)(e) because Rock Creek is of "unique ecological significance because of its impacts on fishery resources and local conditions at the proposed discharge site."

¶16 Revett appeals, and raises the following issue:

¶17 *Did the District Court err when it granted summary judgment to the Plaintiffs?*

## STANDARD OF REVIEW

¶18 We review a district court's grant of summary judgment de novo, applying the same criteria as the district court. *N. Cheyenne Tribe v. Mont. Dep't of Envtl. Quality*, 2010 MT 111, ¶ 18, 356 Mont. 296, 234 P.3d 51. A district court properly grants summary judgment only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *N. Cheyenne Tribe*, ¶ 18.

¶19 An agency's interpretation of its rule is afforded great weight, and we will defer to that interpretation unless it is plainly inconsistent with the spirit of the rule. *Clark Fork Coalition v. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 20, 347 Mont. 197, 197 P.3d 482. We will sustain an agency's interpretation of a rule so long as it lies within the range of reasonable interpretation permitted by the wording. *Clark Fork Coalition*, ¶ 20. Of course, we need not defer to an incorrect agency interpretation. *Clark Fork Coalition*, ¶ 20.

¶20 We review an agency decision not classified as a contested case under the Montana Administrative Procedure Act to determine whether the decision was arbitrary, capricious, unlawful or not supported by substantial law. *Clark Fork Coalition*, ¶ 21. In reviewing an agency decision under the arbitrary and capricious standard, we consider whether the

9

decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *N. Fork Preservation Ass'n v. Dep't of State Lands*, 238 Mont. 451, 465, 778 P.2d 862, 871 (1989) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861 (1989)). Although our review of agency decisions is narrow, we will not automatically defer to the agency ' "without carefully reviewing the record and satisfying [ourselves] that the agency has made a reasoned decision . . . .' " *Friends of the Wild Swan v. Department of Natural Res. & Conservation*, 2000 MT 209, ¶ 28, 301 Mont. 1, 6 P.3d 972 (quoting *Marsh*, 490 U.S. at 378, 109 S. Ct. at 1861).

## DISCUSSION

¶21 As a preliminary matter, Revett argues that the District Court failed to defer to DEQ's expertise in the area of water quality and permitting activities. However, since we review a district court's grant of summary judgment de novo, and we defer to an agency's interpretation of its own rule, it is immaterial whether the District Court deferred to the DEQ.

¶22 Revett also argues as a threshold matter that the District Court failed to set forth the facts or grounds that support its decision such that meaningful appellate review can be made. *See Johnston v. American Reliable Ins. Co.*, 248 Mont. 227, 229, 810 P.2d 1189, 1191 (1991). To the contrary, the District Court made clear that it determined Rock Creek was an area of "unique ecological significance" based on the impacts on fishery resources and local conditions at the discharge site. It set forth specific facts from the 2007 Supplement BiOp in support of its position. Accordingly, the District Court did not err.

¶23 The remainder of Revett's appeal focuses on the District Court's conclusion that because Rock Creek is an area of unique ecological significance, the general permit approval

10

issued by DEQ is void. Revett contends that the mere presence of bull trout alone is not sufficient to justify the conclusion that Rock Creek is an area of unique ecological significance because the USFWS issued a no jeopardy finding in its BiOp for the project, meaning that the project would not endanger bull trout as a species. Revett additionally argues that the implementation of BMPs during road construction would limit sediment deposition, and over the life of the mine would eventually decrease sediment loads in Rock Creek.

¶24 The plaintiffs argue that Rock Creek is of unique ecological significance because, as the District Court concluded, the fishery itself is unique and bull trout habitat conditions are already on the edge.

¶25 DEQ may not approve the use of a general permit in an area of unique ecological significance. Admin. R. M. 17.30.1341(4)(e). To determine whether an area is of unique ecological significance DEQ must take into consideration Montana Stream classifications, impacts on fishery resources, local conditions at the proposed discharge site, and designations of wilderness area or of wild and scenic rivers. Admin. R. M. 17.30.1341(4)(e). The District Court relied exclusively on considerations of the impacts on fishery resources and the local conditions at the proposed discharge sites to find that Rock Creek is an area of unique ecological significance.

¶26 Rock Creek's fishery resource is by all accounts a unique resource. In the final EIS, DEQ described Rock Creek's bull trout population as "an essential stock for conservation purposes," and that it is the stronger of the "only two stocks in the Lower Clark Fork considered to have enough individuals to avoid significant risk of extinction." Compared to

11

the only other such stock, the "Rock Creek stock is considered unique." Though the Rock Creek stock may be at risk of extirpation, and has a limited population of adfluvial bull trout, DEQ specifically noted that Rock Creek is an area "where conservation efforts should focus on recovery of the migratory bull trout." Thus, it is not the mere presence of bull trout, as argued by Revett, that make Rock Creek unique, but instead it is this specific population of bull trout, and the possibility of recovery of an adfluvial population of bull trout that make Rock Creek a unique fishery resource.

¶27 In addition, considerations of "conditions at the proposed discharge site" warrant a conclusion that the area is of unique ecological significance. Presently, Rock Creek is already loaded with sediments and as a result, FWP has warned that "habitat conditions are already on the edge" and "[a]dditional impacts could result in irreversible consequences." The USFWS has similarly concluded that "any increase in sediment deposition is a risk to bull trout habitat productivity and survival rate." This is particularly troublesome because, as noted in the final EIS, "the loss of Rock Creek as a spawning and rearing tributary could push the bull trout further towards elimination in [the] drainage." The risk of extirpation of a unique population of already at-risk bull trout further justifies the finding that Rock Creek is an area of unique ecological significance.

¶28 Revett argues that the implementation of BMPs will minimize any risk to bull trout in the short term and that in the long term, road reconstruction will ultimately benefit bull trout. Even with the implementation of BMPs—which will not eliminate sediment loading entirely—the "habitat impacts caused by an increase in sediment loading . . . would occur sometime during the first five years when site disturbance is greatest due to *construction of*

*roads* and facility development." (Emphasis added.) Moreover, FWP and the USFWS have predicted that road reconstruction and implementation of BMPs will result in further sedimentation of Rock Creek and may result in the permanent loss of bull trout, making it irrelevant that sediment loading will be reduced at the end of the project.

¶29    Accordingly, we conclude that DEQ's approval of the use of General Permit MTR 100000 to allow storm water discharges was arbitrary and capricious because DEQ failed to consider the relevant factors set forth in the law prior to its decision, and as a result, committed a clear error of judgment. Because DEQs interpretation was incorrect, we owe their interpretation of Admin. R. M. 17.30.1341(4)(e) no deference.

## CONCLUSION

¶30    For the reasons stated above, we affirm the District Court's grant of summary judgment to the Plaintiffs.

/S/ MICHAEL E WHEAT


We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS



Justice Jim Rice, dissenting.

13

¶31   I believe the Court has incorrectly stated and applied the standards of review and conducted an analysis which is contrary to the correct standards.

¶32   The Court holds, without citation to authority, that it is "immaterial" whether the District Court failed to defer to DEQ's interpretation of its administrative rule, and failed to defer to DEQ's expertise in the subject matter, because this Court exercises de novo review in summary judgment matters. Opinion, ¶ 21. In effect, the Court holds that the standards applied by the District Court simply don't matter, because in the end this Court can cure any errors by giving necessary deference to the agency when conducting de novo review. I submit that this rendering of our review standards is flawed and will cause problems in future cases.

¶33   While it is technically true that the District Court decided this case by summary judgment, that was done largely as a matter of nomenclature. This is not the typical litigation case where the evidentiary record is developed in discovery. The trial court was not called on to determine whether the evidence demonstrated material factual conflicts. Rather, the evidentiary record—here, a massive one—was compiled before DEQ, which applied its expertise to that record. Consequently, we have held that in such cases that a court's standards of review are narrow—narrower, in my view, than the Court's opinion evidences.

¶34 We have explained that, in these cases, "our standard of review is limited to whether the agency erred in law or whether its decision is wholly unsupported by the evidence or clearly arbitrary or capricious." *Winchell v. Mont. Dep't of Nat. Resources & Conserv.*, 1999 MT 11, ¶ 11, 293 Mont. 89, 972 P.2d 1132. "[W]e only inquire insofar as to ascertain if the agency has stayed within its statutory bounds and has not acted arbitrarily, capriciously, or unlawfully." *Winchell*, ¶ 11. Further, "[w]e afford *great deference* to agency decisions, especially where it implicates substantial agency expertise." *Winchell*, ¶ 11 (emphasis added). "In reviewing an agency decision to determine if it survives the arbitrary and capricious standard, we consider whether the decision was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Clark Fork Coalition*, ¶ 21 (citations omitted).

¶35 A district court's failure to properly apply these standards is legal error which this Court must determine how to remedy. Such error must either be reversed, as in *Clark Fork Coalition*, ¶ 50, or must be remedied by a determination that the case can be affirmed in spite of the error, as in *Winchell*, ¶ 12. We do not have the option of dismissing a district court's erroneous application of the standards of review as "immaterial." Opinion, ¶ 21. A district court's error in the application of the standards commonly leads to an incorrect result, which improperly shifts the burden of demonstrating error on appeal to the wrong party. That is particularly prejudicial in a case that involves a massive evidentiary record and complicated issues, as here. This Court must enforce the proper application of all the standards of review by the district courts.

¶36	Turning to the basis of the Court's decision, the Court concludes that DEQ's approval of the General Permit "was arbitrary and capricious because DEQ failed to consider the relevant factors" and "committed a clear error of judgment." Opinion, ¶ 29. This conclusion is premised on the Court's factual summary of the case. However, the Court's summary of the case is the Court's own story—a story based on a very selective review of the evidentiary record and one that is contrary to the record as a whole. The Court's selective review leads to the conclusion that DEQ "failed to consider the relevant factors," Opinion, ¶ 29, but this conclusion is unsupportable from a proper review of the full record. Indeed, DEQ carefully considered and addressed all of the required factors.

¶37	The Court reasons that DEQ erred by failing to designate the Rock Creek discharge area as one of "unique ecological significance," which in turn is based on two primary factual conclusions: 1) the discharge of sediment from road improvements, which the Court characterizes as the "problem for Revett"; and 2) what the Court describes as the "precarious state" of the bull trout population. *See* Opinion, ¶ 12. I will address each of these factual issues and then turn to the legal issue of the determination of "unique ecological significance."

¶38 Regarding discharge of sediment from road construction, the Court first fails to understand the current state of road sediment discharge. The area of the proposed mine has been logged since the late 1800's and has a patchwork of old clear cuts connected by dirt roads, including the old Forest Service road which will serve as Revett's access road. These historic logging roads have not been properly maintained and are *currently* causing excessive discharge of sediment into Rock Creek, at no fault of Revett. It is estimated that 379 tons of sediment are *currently* being discharged annually into Rock Creek, with corresponding current impact on trout populations. It is estimated that, if unmitigated, Revett's activities could increase the discharge of sediment into Rock Creek by 1,415 tons per year. Thus, mitigation has always been a necessity. The post-EIS Record of Decision by DEQ and the U.S. Forest Service imposed a mitigation requirement under which Revett would decrease sediment discharge by 1,430.4 tons annually—not only mitigating all of its own discharge, but also reducing the *current* discharge by 15.4 tons annually. Then, Revett's actual plan, submitted in response to the imposition of the mitigation requirement, proposed to further mitigate by decreasing annual sediment discharge by an additional 39.5 tons, and thus Revett's project is anticipated to reduce *current* discharge by a total of 54.9 tons annually.

¶39 A question raised about the process of implementing this plan was whether Revett's road construction activity would temporarily increase sediment discharge before full mitigation was in effect. To address this concern, and to ensure that reality comports with the above estimates of sediment discharge, Revett has been required, before beginning and throughout the project, to conduct extensive monitoring of Rock Creek substrate composition, fine sediment levels, and fish population, and to report these results to the

17

agencies. The agencies concluded that this monitoring and mitigation plan "would offset project effects concurrent with construction" and that "there would be no net short-term increase" in sediment discharge during the project. The USFWS added that "[t]he effect of sediment intrusion into the stream channel should be minimized" by these abatement measures.[1]

¶40    On the second factual issue, the bull trout analysis is significantly informed by the USFWS's jeopardy determination. That agency analyzes these questions by geographic area. The Clark Fork River Management Unit is one of 23 geographic units within the Columbia River Recovery region. The Lower Clark Fork Core Area is one of 35 areas within the Clark Fork Unit. The Rock Creek Local Population is one of 14 populations within the Lower Clark Fork Core Area.

¶41    In making its jeopardy determination concerning the small population, in both numbers and size, of the Rock Creek bull trout, the USFWS evaluated the stability of the 14 local populations of bull trout in the Lower Clark Fork Core Area. The USFWS determined that 80 to 90 percent of adfluvial, migratory bull trout in the Core Area are provided by populations which would not be impacted by the project. The USFWS commented that "Rock Creek bull trout are mainly resident fish and contribute relatively little to the Lower Clark Fork Core Area population because they are functionally isolated from the Lake Pend Oreille system (i.e., non-migratory) and have low reproductive potential" and, in any event,

---

[1] It should be noted that the agencies used conservative or "inflated" estimates of total sediment discharge from mining activity to insure that the mitigation requirement would establish "a high probability" that there would be "no net increase in fine sediment in Rock Creek, and a reasonable certainty of an actual reduction in fine sediment transport over the life of the mine."

Rock Creek is "chronically dewatered" much of the year, foreclosing passage for all bull trout.[2] The USFWS's 2006 report concluded that the mining project was not likely to jeopardize the continued existence of bull trout in the Lower Clark Fork Core Area but that adverse impacts to individual bull trout were likely. Thus, as with the sediment issue, mitigation was required. The mitigation measures imposed by the USFWS were in addition to the sediment mitigation measures required by DEQ and the Forest Service, specifying various "reasonable and prudent measures" to minimize harm to individual bull trout.

¶42 In consideration of these mitigation efforts, the EIS concluded that the plan for the project (known as "Alternative V") "now includes protection and mitigation measures needed to support the bull trout recovery effort and protect all forms of the species." The agencies observed that the risk of adverse effects to bull trout under Alternative V was "minor" and only marginally greater than not constructing the mine at all, and that was only because, in operating a mine, the risk of human error could not be eliminated. Regarding the entire Phase II construction and operation of the mine, the USFWS concluded that any impact on bull trout would be diminutive and not likely to have an appreciable effect. The EIS concluded that "Alternative V now protects the Rock Creek bull trout subpopulation" during initial construction, and that mitigation actually provided a "high likelihood" of an "improving trend in aquatic resources over the life of the project." As noted by the Court, in

_____

[2] The USFWS noted that as many as 10 adfluvial bull trout were found in Rock Creek during ideal stream conditions in 2004, but that the usual number is 0 to 4 in dewatered times. For purposes of this dissent, I will not further develop from the record the distinction between migratory and local (or "fluvial") populations.

2007 the USFWS issued a supplement that found that the mine would not jeopardize bull trout. Opinion, ¶ 8.

¶43 This discussion of the evidence is not meant to refute the Court's version of the record—that's not the point. The point is that the limited standard of review in this case requires that courts determine whether the agency's decision is "wholly unsupported by the evidence," or was arbitrary and capricious. Clearly, there was considerable evidence to support DEQ's grant of the permit—evidence which the Court chooses not to consider and it cannot credibly be said that DEQ's decision was "wholly unsupported by the evidence." I now turn to the legal issue of DEQ's determination that the Rock Creek area was not one of "unique ecological significance" under the governing regulation.

¶44 The Court appears to reach a lay fisherman's conclusion about Rock Creek's "uniqueness" instead of applying the governing legal principles. The regulation provides that DEQ may deny a permit if:

> (e) the point source will be located in an area of unique ecological or recreational significance. *Such determination must be based upon considerations of Montana stream classifications adopted under 75-5-301, MCA, impacts on fishery resources, local conditions at proposed discharge sites, and designations of wilderness areas under 16 USC 1132 or of wild and scenic rivers under 16 USC 1274.*

Admin. R. M. 17.30.1341(4)(e). (Emphasis added.)

20

¶45 First, pursuant to the cross-referenced § 75-5-301, MCA, entitled "Classifications and standards for state waters," Rock Creek is classified as a B-1 river, the same class as a majority of Montana's streams and rivers. Given the numerous streams in Montana so classified, this does not give any uniqueness to Rock Creek. Rather, Montana rivers which are recognized for their unique ecological significance are classified as "Outstanding Resource Waters." *See* §§ 75-5-315; -316, MCA.

¶46 Pursuant to the cross-referenced federal statutes, the Rock Creek area is not in a designated wilderness area and Rock Creek is not designated as a wild and scenic area. Consequently, the Court must look to the more general "impacts on fishery resources" and "local conditions at proposed discharge sites" in order to conclude the site is ecologically significant.

¶47 However, in addition to the evidence already discussed, there is abundant further evidence in the record that the bull trout population and habitat of this area is not in any way "unique." According to the USFWS, the Rock Creek bull trout population is but one of 150 local bull trout populations in the Clark Fork River Management Unit and one of 14 local populations in the Lower Clark Fork Core Area. The USFWS explained that the populations in Rock Creek (7.1 miles) are a small part of the population in the Bull River (35.3 miles) and a very small part of the *3,372 miles* of bull trout habitat in the Clark Fork River Management Unit. In fact, the USFWS essentially concluded that wiping out the entire Rock Creek population would not impact the health of the bull trout in the Lower Clark Fork Core Area—but proposed mitigation efforts would avoid that and would even go so far as to mitigate impacts to individual bull trout. Further, as discussed above, the mitigation efforts,

21

including monitoring of sediment levels and fish populations, and the reduction of current sediment discharge, would not only ensure protection of existing resources, but would serve to enhance them. There is nothing unique about the bull trout habitat in this particular area, but even if there was, the mitigation efforts will actually serve to improve trout habitat, even during the construction phase.

¶48 The duty of the courts in applying the arbitrary and capricious standard is to determine whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Clark Fork Coalition*, ¶ 21 (citation omitted). Further, we defer to an agency's interpretation of its regulation, *Clark Fork Coalition*, ¶ 20, and in cases such as this one, "[w]e afford *great deference* to agency decisions, especially where it implicates substantial agency expertise," *Winchell*, ¶ 11 (emphasis added). Clearly, DEQ engaged in a careful review of all the necessary factors and made a judgment well supported by the record in a complicated matter which heavily implicated its expertise. Its judgment was reasonable and was not a "clear error." It is not the duty of this Court to second guess the agency about the record or to substitute its judgment for the agency. However, by relying primarily on the 2000-2001 Biological Opinion and the 2007 supplemental Biological Opinion issued by the USFWS to the exclusion of the vast majority of the abundant evidence available to DEQ, it appears the Court has done exactly that.

¶49 The District Court concluded that "the spirit" of the regulation required a finding that Rock Creek was of unique ecological significance. The District Court failed to consider vast portions of the record. Citing to a few pieces of the record, the District Court substituted its

22

judgment for the agency. This Court has done the same and has failed to properly apply the governing standards. I would reverse.

/S/ JIM RICE

Justice Patricia O. Cotter joins in the dissenting opinion of Justice Rice.

/S/ PATRICIA COTTER

Justice Beth Baker did not participate in this matter.